**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000426
28-FEB-2022
02:37 PM
Dkt. 140 MO**

NO. CAAP-17-0000426

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
MACDON DONNY THROMMAN, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CR. NOS. 15-1-216K and 16-1-299K)


MEMORANDUM OPINION
(By:  Ginoza, Chief Judge, Leonard and McCullen, JJ.)

### I.  Introduction

Defendant-Appellant Macdon Thromman (**Thromman**) appeals from the "Judgment of Conviction and Sentence" (**Judgment**) entered on April 18, 2017, by the Circuit Court of the Third Circuit (**Circuit Court**).[1]  As part of his appeal, Thromman also challenges the Circuit Court's "Findings of Facts and Conclusions of Law Re: Motion to Determine Voluntariness of Defendant's Statements" (**Voluntariness Order**), entered on January 18, 2017, and the "Findings of Fact and Conclusions of Law Re: Defendant's Motion to Dismiss Counts 14-15 in Cr. No. 15-1-216K and Counts 1-27 in Cr. No. 16-1-299K" (**Order Denying Dismissal**), entered on January 31, 2017, both in favor of Plaintiff-Appellee State of Hawai'i (**State**).

This case arises from a July 13-14, 2015 incident during which Thromman allegedly assaulted and shot Heather Coito

---

[1]  The Honorable Ronald Ibarra presided.

(**Heather**), the mother of his two minor children who lived with Thromman at the time.  In an ensuing police response by the Hawai'i Police Department (**HPD**), Thromman allegedly shot at HPD Officer Ray Fukada (**Officer Fukada**) and Officer Dale Ku (**Officer Ku**), injuring Officer Fukada in the process.  Thromman proceeded to barricade himself inside his residence, prompting an armed standoff with HPD that lasted several hours.  After failed attempts by HPD's Crisis Negotiation Team (**CNT**) to negotiate Thromman's surrender, HPD deployed oleoresin capsicum (**pepper spray**) canisters into his residence.  In response Thromman allegedly fired at HPD officers, including Officer Paul Kim (**Officer Kim**).  Thromman eventually surrendered to police, and was indicted on multiple counts.

After a jury trial, Thromman was found guilty on nine counts: Attempted Murder in the Second Degree, in violation of Hawaii Revised Statutes (**HRS**) §§ 705-500(1)(b) (2014)[2] and 707-701.5 (2014)[3] (**count 3** in Cr. No. 16-1-299K indictment); four counts of Terroristic Threatening in the First Degree, two being in violation of HRS §§ 707-715(1) (2014)[4] and 707-716(1)(b)

_____

[2]  HRS § 705-500(1)(b) provides:

> **§705-500  Criminal attempt.**  (1) A person is guilty of an attempt to commit a crime if the person:
> . . . .
>     (b)    Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.

[3]  At the time of the offense, HRS § 707-701.5 provided:

> **[§707-701.5]  Murder in the second degree.**  (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
>     (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[4]  HRS § 707-715(1) provides:

> **§707-715  Terroristic threatening, defined.**  A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage or harm to property,
> (continued...)

(2014) and/or 707-716(1)(e) (2014)[5] (**counts 7 and 8** in Cr. No. 16-1-299K indictment) and two in violation of HRS § 707-715(1) and HRS § 707-716(1)(e) (**counts 17 and 26** in Cr. No. 16-1-299K indictment); Kidnapping, in violation of HRS §§ 707-720(1)(d) (2014) and/or 707-720(1)(e) (2014)[6] (**count 10** in Cr. No. 16-1-299K indictment); Assault in the First Degree, in violation of HRS § 707-710 (2014)[7] (**count 13** in Cr. No. 16-1-299K indictment); Reckless Endangering in the Second Degree, in violation of HRS § 707-714(1)(b) (2014)[8] (**count 20** in Cr. No. 15-1-216K

---

[4](...continued)
including the pets or livestock, of another or to commit a felony:
(1)	With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

[5]	HRS § 707-716(1)(b) & (e) provides:

**§707-716  Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:
. . . .
(b)	By threats made in a common scheme against different persons[.]
. . . .
(e)	With the use of a dangerous instrument or a simulated firearm. For purposes of this section, "simulated firearm" means any object that:
(i)	Substantially resembles a firearm;
(ii)	Can reasonably be perceived to be a firearm; or
(iii) Is used or brandished as a firearm[.]

[6]	HRS § 707-720(1)(d) & (e) provides:

**§707-720  Kidnapping.** (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
. . . .
(d)	Inflict bodily injury upon that person or subject that person to a sexual offense;
(e)	Terrorize that person or a third person[.]

[7]	HRS § 707-710 provides:

**§707-710  Assault in the first degree.** (1) A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person.
(2)	Assault in the first degree is a class B felony.

[8]	HRS § 707-714(1)(b) provides:

(continued...)

3

indictment); and Permits to Acquire, in violation of HRS §§ 134-2(a) (2011)[9] and 134-17 (2011)[10] (**count 21** in Cr. No. 15-1-216K indictment).

---

[8](...continued)

§**707-714  Reckless endangering in the second degree.** (1) A person commits the offense of reckless endangering in the second degree if the person:
. . . .
    (b)  Intentionally discharges a firearm in a populated area, in a residential area, or within the boundaries or in the direction of any road, street, or highway; provided that the provisions of this paragraph shall not apply to any person who discharges a firearm upon a target range for the purpose of the target shooting done in compliance with all laws and regulations applicable thereto.

[9] At the time of the offense, HRS § 134-2(a) provided:

§**134-2  Permits to acquire.** (a) No person shall acquire the ownership of a firearm, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior law or by a prior owner or unregistered, either by purchase, gift, inheritance, bequest, or in any other manner, whether procured in the State or imported by mail, express, freight, or otherwise, until the person has first procured from the chief of police of the county of the person's place of business or, if there is no place of business, the person's residence or, if there is neither place of business nor residence, the person's place of sojourn, a permit to acquire the ownership of a firearm as prescribed in this section. When title to any firearm is acquired by inheritance or bequest, the foregoing permit shall be obtained before taking possession of a firearm; provided that upon presentation of a copy of the death certificate of the owner making the bequest, any heir or legatee may transfer the inherited or bequested firearm directly to a dealer licensed under section 134-31 or licensed by the United States Department of Justice without complying with the requirements of this section.

[10] HRS § 134-17 provides:

§**134-17  Penalties.** (a) If any person gives false information or offers false evidence of the person's identity in complying with any of the requirements of this part, that person shall be guilty of a misdemeanor, provided, however that if any person intentionally gives false information or offers false evidence concerning their psychiatric or criminal history in complying with any of the requirements of this part, that person shall be guilty of a class C felony.
    (b)  Any person who violates section 134-3(a) shall be guilty of a petty misdemeanor.
    (c)  Any person who violates section 134-2, 134-4, 134-10, 134-15, or 134-16(a) shall be guilty of a misdemeanor. Any person who violates section 134-3(b) shall be guilty of a petty misdemeanor and the firearm shall be confiscated as contraband and disposed of, if the firearm is not registered within five days of the person receiving notice of the violation.

On appeal, Thromman raises seven points of error, contending the Circuit Court erred in: (1) the Order Denying Dismissal because the CNT failed to memorialize or record its negotiations with Thromman during the armed standoff, thus depriving Thromman of potentially exculpatory evidence and a fair trial; (2) the Voluntariness Order because Thromman's statements made to the CNT during its negotiations were made without any Miranda warnings, and thus were inadmissible at trial; (3) denying Thromman's request to include Kidnapping in the merger instruction for the offenses involving Heather; (4) excluding lay witness testimony in support of Thromman's Extreme Mental or Emotional Disturbance (**EMED**) defense at trial; (5) permitting the State to recall Heather as a witness and permitting publication of hearsay statements that were neither denied nor contradicted by her testimony; (6) admitting the State's Exhibit 431, a news video portraying Thromman after the incident in police custody and being placed into a vehicle, into evidence; and (7) sentencing Thromman to consecutive prison terms without putting reasons on the record.

After careful review, we conclude the Circuit Court did not err in its Order Denying Dismissal, and that Thromman waived his arguments related to the Voluntariness Order because he did not object to or otherwise challenge the voluntariness of his statements to the CNT in the Circuit Court.  We further conclude the Circuit Court did not err in admitting the State's Exhibit 431 or in excluding proffered testimony about Thromman's alleged request for counseling services at work and his having anxiety attacks preceding the incident in support of his EMED defense.

However, we conclude the Circuit Court erred by admitting hearsay evidence –- audio recordings of an HPD interview of Heather –- under Hawaiʻi Rules of Evidence (**HRE**) Rules 802.1 and 613(b), which was relevant to Thromman's convictions in: **count 7**, Terrorist Threatening in the First Degree related to Timothy Coito (**Timothy**), Heather's father; **count 10**, Kidnapping relating to Heather; and **count 13**, Assault

in the First Degree related to Heather.  We also conclude the Circuit Court erred in rejecting Thromman's request that the Kidnapping charge, **count 10,** be included in a merger instruction to the jury.  We therefore vacate the Judgment with respect to **counts 7, 10,** and **13,** and remand for a new trial on these counts.

We further conclude the Circuit Court did not provide adequate reasons in the record for its imposition of consecutive sentences for **counts 3, 17,** and **26.**  We thus vacate the consecutive sentences for these counts and remand for further proceedings so that the Circuit Court may further address consecutive sentencing for these counts.

We affirm in all other respects.

## II.  Background

### A.    Relevant Pretrial Motions

On August 10, 2015, the State filed a twenty-two count indictment against Thromman in relation to the July 13-14, 2015 incident in Cr. No. 15-1-216K.  On September 12, 2016, Thromman was re-indicted in Cr. No. 16-1-299K on twenty-seven charges. Accordingly, on September 20, 2016, the Circuit Court dismissed many of the counts in Cr. No. 15-1-216K and the cases were consolidated on October 14, 2016.

On March 8, 2016, the State filed its Motion to Determine Voluntariness of Defendant's Statements.  The Motion sought an order determining whether certain statements Thromman made to HPD during and after the incident, including statements made to the CNT team during its negotiations, were voluntarily made.  On January 18, 2017, the Circuit Court entered its Voluntariness Order.  It is undisputed that Thromman did not object to the admission of any statements at the hearings on the State's motion.

On October 31, 2016, Thromman filed his "Notice of Motion of Macdon Donny Thromman to Dismiss Counts 14-15 in CR 15-1-216K and Counts 1-27 in CR 16-1-299K" (**Motion to Dismiss**).  In his Motion to Dismiss, Thromman argued, *inter alia*, that twenty-eight of the thirty-two charges must be dismissed with prejudice

6

due to the State's spoliation of and failure to preserve potentially exculpatory evidence, including "numerous statements made by [Thromman] during negotiations with police spanning 20 hours."  Thromman asserted that the CNT's failure to record its negotiations with Thromman during the incident or to keep adequate notes of the conversations deprived him of crucial evidence such that it violated his due process right to a fair trial.  On January 17, 2017, the Circuit Court orally denied Thromman's Motion to Dismiss and entered its Order Denying Dismissal on January 31, 2017.

> **B.    Relevant Evidence Presented at Trial**

On January 17, 2017, a jury trial commenced in the State's case against Thromman.  Relevant to this appeal, the State introduced the following exhibits into evidence in its case against Thromman: (1) State's Exhibit 431, a video of media footage depicting Thromman in police custody and being placed into a vehicle for transport on the day of the incident; and (2) State's Exhibits 430E, 430F, 430G, 430I, 430J, 430K, 430L, and 430M, which are audio recordings of various statements that Heather allegedly made to HPD following the incident.

As more fully explained in our discussion, the State sought to introduce State's Exhibit 431 as probative evidence of Thromman's demeanor and appearance on the day of the incident and to rebut Thromman's claim that his ability to see was impaired by pepper spray canisters deployed by HPD.  The State sought to introduce Exhibits 430E-G and 430I-M under HRE Rules 802.1 and 613(b), relating to prior inconsistent statements, to impeach Heather's testimony at trial that she could not remember making the statements recorded in her interview with HPD following the incident.  The Circuit Court admitted the aforementioned exhibits into evidence over Thromman's objection.

As part of his defense, Thromman sought to introduce the testimony of Jayson Galinato (**Galinato**) and Kyle Kawai (**Kawai**) in support of his claim that he was under the influence of EMED at the time of the incident.  In his offer of proof,

Thromman asserted that the witnesses would testify that Thromman had requested to obtain counseling services from his employer in the days preceding the incident and that Thromman had suffered multiple anxiety attacks in the months preceding the incident. As more fully explained in our discussion, the Circuit Court ultimately precluded the testimony of both witnesses because it determined that the evidence was not relevant to show that Thromman was under the influence of EMED on the day of the incident and because neither witnesses were qualified to connect the past behavior to the behavior on the day of the incident.

C.    **Jury Instruction, Verdict and Sentence**

Prior to the case being submitted to the jury, Thromman requested that the jury be instructed on merger for all offenses and lesser included offenses involving Heather, including count 10, Kidnapping.  The Circuit Court ultimately instructed the jury regarding potential merger of all charges involving Heather, except Kidnapping.

After its deliberations, the jury returned guilty verdicts on nine of the twenty-one charges that went to trial, which were: **count 3**, Attempted Murder in the Second degree (relating to Officer Fukada); **counts 7, 8, 17, and 26**, Terroristic Threatening in the First Degree (relating to Timothy, Ann Coito (Heather's mother), Officer Dale Ku and Officer Paul Kim); **count 10**, Kidnapping (relating to Heather); **count 13**, Assault in the First Degree (relating to Heather); **count 20**, Reckless Endangering in the Second Degree; and **count 21**, Permit to Acquire Firearm.

On April 18, 2017, the Circuit Court entered its Judgment and corresponding sentence.  As part of its sentence, the Circuit Court sentenced Thromman to: life imprisonment with possibility of parole on count 3, with a mandatory minimum term of fifteen years; five years imprisonment as to each count on counts 7 and 8, with a mandatory minimum term of three years, concurrent with all other charges; twenty years imprisonment on count 10, with a mandatory minimum term of ten years, concurrent

with all other charges; ten years imprisonment on count 13, with a mandatory minimum term of five years, concurrent with all other charges; five years imprisonment as to each count on counts 17 and 26, with a mandatory minimum term of three years, consecutive with each other and consecutive with count 3; one year of imprisonment on count 20, concurrent with all other charges; and one year of imprisonment on count 21, concurrent with all other charges.

### III.  Standards of Review

#### A.  Due Process Right to a Fair Trial

"We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case.  Thus, we review questions of constitutional law under the right/wrong standard."  State v. Jenkins, 93 Hawaiʻi 87, 100, 997 P.2d 13, 26 (2000) (internal quotation marks and citations omitted).

#### B.  Admissibility of Evidence

"As a general rule, [the appellate] court reviews evidentiary rulings for abuse of discretion."  State v. Acacio, 140 Hawaiʻi 92, 98, 398 P.3d 681, 687 (2017) (alteration in original) (citing Kealoha v. County of Hawaiʻi, 74 Haw. 308, 319, 844 P.2d 670, 676 (1993)). "However, when there can only be one correct answer to the admissibility question, or when reviewing questions of relevance under Hawaiʻi Rules of Evidence (HRE) Rules 401 and 402, [the appellate] court applies the right/wrong standard of review."  Id. (citing Kealoha, 74 Haw. at 319, 844 P.2d at 676) (alteration in original) (other citations omitted).

We review evidentiary rulings under HRE Rules 802.1 and 613(b) under the right/wrong standard.  See State v. Ortiz, 91 Hawaiʻi 181, 189, 981 P.2d 1127, 1135 (1999).

#### C.  Jury Instructions

"[W]hen jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or

misleading."  State v. Mark, 123 Hawaiʻi 205, 219, 231 P.3d 478, 492 (2010) (citation, internal quotation marks, and brackets omitted).  Jury instructions "must be examined in the light of the entire proceedings and given the effect which the whole record shows [them] to be entitled."  State v. Nichols, 111 Hawaiʻi 327, 334, 141 P.3d 974, 981 (2006) (citation omitted).

### D.  Findings of Fact and Conclusions of Law

A circuit court's findings of fact and conclusions of law are reviewed as follows:

[A] trial court's findings of fact are subject to the clearly erroneous standard of review. A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with a definite and firm conviction that a mistake has been committed.

A conclusion of law is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews conclusions of law under the right/wrong standard. Thus, a conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned. However, a conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case."

State v. Rapozo, 123 Hawaiʻi 329, 336, 235 P.3d 325, 332 (2010) (alteration in original) (citation omitted).

### IV.  Discussion

A.  **HPD's decision not to record its negotiations with Thromman did not deprive him of his due process rights to a fair trial.**

1.  **Relevant case authority**

In his first point of error, Thromman asserts that HPD's decision not to record or adequately memorialize the CNT negotiations, which he contends would have constituted material evidence of whether he intended to kill Heather and Officer Fukada, his EMED defense, and whether his statements to CNT negotiators were voluntarily made, violated his due process right to a fair trial.  Thromman also contends there is evidence that HPD acted in bad faith in failing to record the CNT negotiations

and there was no equivalent evidence available to mitigate the harm to his defense.  Thromman thus asserts the Circuit Court erred in denying his Motion to Dismiss, and asks this court to reverse his convictions.

In <u>Arizona v. Youngblood</u>, 488 U.S. 51 (1988), the United States Supreme Court considered the due process implications of the prosecution's inadvertent loss or destruction of potentially exculpatory evidence that had been collected by law enforcement officials. 488 U.S. at 57-58.  The Court ultimately held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."  <u>Id.</u> at 58.  In <u>State v. Matafeo</u>, 71 Haw. 183, 787 P.2d 671 (1990), the Hawai'i Supreme Court went beyond the majority decision in <u>Youngblood</u>, and determined that under Hawai'i law, "[i]n certain circumstances, regardless of good or bad faith, the State may <u>lose or destroy</u> material evidence which is 'so critical to the defense as to make a criminal trial fundamentally unfair' without it."  71 Haw. at 187, 787 P.2d at 673 (emphasis added) (citing <u>Youngblood</u>, 488 U.S. at 61 (Stevens, J., concurring)).  Thus, Thromman asserts under <u>Matafeo</u> that dismissal of his case is appropriate because HPD acted in bad faith in failing to record or adequately memorialize the CNT negotiations, which he contends was material to his defense.

We note, however, that <u>Matafeo</u> and <u>Youngblood</u> are factually distinguishable from the instant case because they both dealt with the State's failure to <u>preserve</u> potentially exculpatory evidence that had been collected by the police, rather than an alleged failure of law enforcement officials to <u>collect</u>, or in this case <u>create</u> evidence in the first instance (i.e., to record or memorialize the CNT negotiations).  <u>See</u> <u>Matafeo</u>, 71 Haw. at 184, 787 P.2d at 672 (noting police inadvertently destroyed all physical evidence collected relating to appellant's case); <u>Youngblood</u>, 488 U.S. at 53-54 (noting the

State failed to properly preserve samples and evidence of sexual assault).

Other jurisdictions have recognized that law enforcement officials generally have no duty to collect particular evidence at the crime scene.  See Miller v. Vasquez, 868 F.2d 1116, 1119-20 (9th Cir. 1989) (noting that the government's duty to preserve evidence does not impose a duty to obtain evidence); State v. Ware, 881 P.2d 679, 683 (N.M. 1994) (noting that "[u]sually, the failure to gather evidence is not the same as the failure to preserve evidence, and that the State generally has no duty to collect particular evidence at the crime scene" (citations omitted));  State v. Steffes, 500 N.W. 2d 608, 612 (N.D. 1993) (holding that "[p]olice generally have no duty to collect evidence for the defense"); People v. Bradley, 205 Cal. Rptr. 485, 488 (Cal. Ct. App. 1984) (holding that the duty to preserve evidence does not encompass an initial duty to gather or collect or seize potential evidence at the scene of the crime for defendant's use); Taylor v. State, 335 P.3d 1218, 1222 (Mont. 2014) (holding police officers have no duty to assist in procuring evidence for a defendant, and "[a] defendant must show bad faith to prove a due process violation when lost evidence is only potentially exculpatory, rather than apparently exculpatory").

In Miller, the Ninth Circuit Court of Appeals discussed the due process implications of the government's failure to collect potentially exculpatory evidence.  868 F.2d at 1119-21 (discussing whether police failure to collect victim's bloodstained jacket and to photograph defendant's scratched arms violated defendant's due process right to a fair trial).  The court first noted that while "the government may have a duty to preserve evidence after the evidence is gathered and in possession of the police[,]" such duty "[does] not impose a duty to obtain evidence."  868 F.2d at 1119 (emphases in original) (citations omitted).

12

The court did, however, hold that "a bad faith failure to collect potentially exculpatory evidence would violate the due process clause." Id. at 1120.  The court reasoned that, just as in Youngblood,

> limiting the scope of the due process clause in this context to a bad faith failure to collect such evidence "both limits the extent of the police's obligation . . . to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

Id. (ellipses in original) (quoting Youngblood, 488 U.S. at 58).

For purposes of this case, we need not decide whether to adopt the articulation of due process rights set forth in Miller regarding the failure to collect potentially exculpatory evidence.  As discussed below, even assuming arguendo that the Miller rule applied, the Circuit Court properly found no bad faith on the part of HPD.

**2.    The Circuit Court did not err in its order denying dismissal**

The Circuit Court's conclusion that Thromman's due process rights were not violated based on the failure of officers to record or memorialize the CNT negotiations was dependent on the Circuit Court's relevant findings of fact.  We therefore review the Circuit Court's Order Denying Dismissal under the clearly erroneous standard.  See Rapozo, 123 Hawaiʻi at 336, 235 P.3d at 332.  "In the absence of evidence of bad faith by the State, we cannot presume that the police detectives involved in the investigation will be less than truthful about the evidence." Matafeo, 71 Haw. at 188, 787 P.2d at 674.  In its Order Denying Dismissal, the Circuit Court concluded that Thromman made "no showing of materiality or bad faith by the actions of the [HPD,]" and thus denied his Motion to Dismiss.

Thromman asserts there is evidence that HPD acted in bad faith in its decision not to record or adequately memorialize the CNT negotiations.  Thromman asserts: (1) the responding CNT

officers had all acknowledged they were informed that Thromman had shot fellow HPD Officer Fukada, and thus had an "animus" toward defendant; (2) HPD had also disregarded potentially exculpatory evidence in executing a search warrant of the premises <u>after the shooting occurred</u>; (3) HPD's "implausible and contradictory excuses" for not recording the negotiations; and (4) HPD Sergeant Reynold Kahalewai's (**Sergeant Kahalewai**) decision making on the days of the incident and his delayed production of his police report and handwritten notes of the incident.  In light of the Circuit Court's findings, which are unchallenged, these assertions do not convince us that HPD acted in bad faith in not recording the CNT negotiations.

In its Order Denying Dismissal, the Circuit Court made relevant findings of fact regarding HPD and the CNT's response to the July 13-14, 2015 incident, which are not challenged by Thromman and are thus binding on this Court.  <u>See</u> <u>Rapozo</u>, 123 Hawaiʻi at 334 n.4, 235 P.3d at 330 n.4.  The Circuit Court's findings indicated that on the day of the incident, HPD officers retrieved CNT equipment to potentially be used in the ongoing negotiations with Thromman.  Such equipment included a "throw phone," which is a device that can be thrown to a barricaded person that allows police to communicate with that person.  The "throw phone" is connected to a "call box" by a cable line, and the "call box" is capable of recording the conversations on a cassette tape.  HPD did not use the "throw phone" to communicate with Thromman during the incident, and instead communicated with him primarily through the land line located in the North Kohala Police Station.

The Circuit Court found that,

> [i]n this case, the throw phone was not optimal because of the dangerousness of the situation, their Ford 250 was not bullet proof, negotiations were on-going prior to the equipment arriving, and there was not enough cable between the North Kohala Police Station and the house Defendant barricaded himself within.  If the call box were to be used, the phone company's assistance was necessary to enable officers to use the call box with the station phone; this would interfere with ongoing negotiations.

As indicated in the Circuit Court's findings, HPD had strategic, practical, and safety reasons for not using the "throw phone" to negotiate with Thromman or to record the conversations with the "call box".  The findings also indicate that CNT negotiators did not conduct negotiations with Thromman on a speaker phone "because the background noise would make it difficult to negotiate with [Thromman]" and because Sergeant Kahalewai "was concerned that [Thromman] would hear things not intended for him."  Thus, it was not feasible for HPD to conduct the negotiations on speaker phone so that a scribe could transcribe or record the conversations.

Further, as the Circuit Court noted in its conclusions of law, HPD and CNT members were responding to an emergency situation where Thromman was armed and had allegedly shot Heather and Officer Fukada.  Thus, the Circuit Court found that HPD was concerned with the immediate barricaded situation and was not concerned with recording the negotiations.

Based on the record, the Circuit Court did not err in denying Thromman's Motion to Dismiss.

B.  **Thromman's challenge to the Circuit Court's Order Granting the State's Motion to Determine Voluntariness was not asserted below and is thus waived.**

For the first time on appeal, Thromman asserts that his statements made to the CNT negotiators during the July 13-14, 2015 negotiations were inadmissible because they were elicited through a custodial interrogation of Thromman, where no Miranda[11] warnings were given.  Thromman concedes that he did not object to the admissibility of these statements at the time of the hearing on the State's Motion to Determine Voluntariness.  "As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal; this rule applies in both criminal and civil cases." State v. Moses, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2003) (citation omitted).

---

[11]  Miranda v. Arizona, 384 U.S. 436 (1966).

Thus, Thromman has waived the issue and we need not discuss it further.

     **C.**    **Generalized testimony of Thromman's alleged attempt to obtain counseling and anxiety attacks preceding the incident, without more, was not relevant to Thromman's EMED defense.**

In count 3, Thromman was convicted of Attempted Murder in the Second Degree for shooting Officer Fukada.  In his fourth point of error, Thromman asserts the Circuit Court erred in excluding the testimony of Galinato and Kawai in support of his EMED defense.  Galinato and Kawai were friends of Thromman, and Galinato was also Thromman's supervisor at work.  Thromman asserts that Galinato's and Kawai's testimony regarding Thromman's mental state in the days and months preceding the incident were "highly relevant evidence of his subjective sense that he desperately needed professional help[,]" and were thus relevant to his EMED defense to the attempted murder charge.  We disagree.

"EMED is an affirmative defense to murder or attempted murder, 'which reduces the offense to manslaughter or attempted manslaughter' if 'the defendant was, <u>at the time the defendant caused the death of the other person</u>, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation.'"  <u>State v. Adviento</u>, 132 Hawaiʻi 123, 137, 319 P.3d 1131, 1145 (2014) (emphasis added) (footnote and citation omitted).  "The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be."  <u>Id.</u> (quotation marks and citation omitted).

At trial, Thromman sought to introduce the testimony of Galinato and Kawai to support his EMED defense.  Specifically, Thromman anticipated that Galinato would testify to his knowledge of Thromman's efforts in the days preceding the incident to obtain counseling services offered through his employer for stress related issues with his work and family that was

ultimately denied.[12]  Thromman anticipated that Kawai would testify that Thromman had suffered from multiple debilitating anxiety attacks in the months preceding the incident.  Thromman asserted that the evidence of his prior efforts to obtain counseling and his anxiety attacks preceding the incident were relevant to his behavior on the day of the incident, including whether there was a reasonable explanation that he was under the influence of EMED at the time of the incident.  Thromman also asserted that each witness's testimony would be offered to show Thromman's then-existing state of mind or physical condition.

The Circuit Court ultimately precluded Galinato and Kawai's testimony because it determined that it would be irrelevant to Thromman's EMED defense without other evidence such as medical expert testimony, or Thromman himself, to connect the past behavior, i.e., him seeking counseling for stress and his alleged anxiety attacks, to his behavior on the day of the incident.  The Circuit Court indicated that as lay witnesses, Galinato and Kawai were not qualified to relate the previous instances of stress and anxiety attacks to how Thromman had acted on the day of the incident.  Also, it appears the Circuit Court believed that only a medical expert could speak to the "medical probability" of the relation of Thromman's prior conduct to his state of mind at the time of the incident.

The Circuit Court noted that it would have been more inclined to allow Galinato and Kawai's testimony had there been other evidence that Thromman was suffering from EMED at the time of the incident.  However, the Circuit Court ultimately disallowed the testimony based on the "state of the record" at that point in trial, noting that if other witnesses could lay other foundation it may allow the testimony.

We first note the Circuit Court erred to the extent that it appeared to require Thromman to present medical expert

_____

[12]  Thromman indicated that he was unsure of the exact date of when Galinato had become aware of Thromman's efforts to obtain counseling, but he stated that he believed it was in the days immediately preceding the incident.

testimony in support of his EMED defense.  The Supreme Court of Hawai‘i has explained that "[e]xpert testimony about defendant being under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation is allowable, since such a disturbance can reduce a murder to manslaughter."  State v. Klafta, 73 Haw. 109, 117, 831 P.2d 512, 517 (1992) (emphasis added) (citation omitted).  However, we have previously noted we were "not rul[ing] that expert testimony is required to explain a defendant's mental or emotional disturbance."  State v. Tyquiengco, 6 Haw.App. 409, 411 n.2, 723 P.2d 186, 188 n.2 (1986).  Thus, the Circuit Court erred in excluding Galinato's and Kawai's testimony to the extent that it found that medical expert testimony was required.

However, the Circuit Court's error was harmless because Galinato's and Kawai's proffered testimony was not relevant to whether Thromman was under the influence of EMED at the time of the incident or whether there was a reasonable explanation for the disturbance at that time.  As this court explained in State v. Pavich, "the relevant inquiry is whether the defendant was under the influence of an EMED 'at the time he [committed the crime].'"  119 Hawai‘i 74, 88-89, 193 P.3d 1274, 1288-89 (App. 2008) (emphasis and alteration in original) (quoting State v. Moore, 82 Hawai‘i 202, 210, 921 P.2d 122, 130) (1996)).  Moreover, as the Hawai‘i Supreme Court has explained, "EMED manslaughter is the intentional or knowing killing of another while under the influence of a reasonably induced emotional disturbance causing a temporary loss of normal self-control, as described in HRS § 707-702(2)."  State v. Aganon, 97 Hawai‘i 299, 304, 36 P.3d 1269, 1274 (2001) (emphasis added) (brackets, ellipsis, and internal quotations omitted) (citing State v. Sawyer, 88 Hawai‘i 325, 333, 966 P.2d 637, 645 (1998)).

As Heather testified, on the evening of the incident, Thromman "wanted to work things out" with Heather but Heather told him she "didn't want to."  Sergeant Kahalewai also testified to receiving information that Heather had told Thromman she was

18

seeing someone else.  Heather further testified that after she told Thromman she did not want to work things out, Thromman "got mad" and "left [to get] a rifle."  When Thromman returned, he continued to ask Heather to work things out to which she responded she did not want to and they continued "arguing back and forth about [their relationship]."  The situation got worse from there.

Given the record in this case, there was no proffer that either Galinato or Kawai could testify to Thromman's state of mind on the day of the incident, or that they could provide a link between Thromman's alleged prior anxiety attacks and attempt to seek counseling from his employer to his behavior on the day of the incident.  Without such a link, the proffered evidence was not probative of the presence or reasonableness of Thromman's alleged EMED when he shot Officer Fukada, for purposes of count 3.  See State v. Lavoie, 145 Hawaiʻi 409, 426, 453 P.3d 229, 246 (2019) as corrected (Dec. 2, 2019).  In Lavoie, the Hawaiʻi Supreme Court held that evidence of a defendant's prior abuse against his wife was not probative as to his state of mind at the time he shot her or the reasonableness of his state of mind, explaining:

> the evidence of Lavoie's prior abuse had little, if any, probative value as to his state of mind at the time of the shooting or to its reasonableness. Lavoie's EMED defense stemmed from the stress that he felt after Kahalewai said she would leave him, coupled with Kahalewai's insults and references to his childhood sexual trauma immediately prior to the shooting. The evidence of his prior abuse of Kahalewai was not probative of the presence or reasonableness of Lavoie's EMED because the witnesses testifying to the incidents did not link the abuse to Kahalewai leaving Lavoie.  Absent such a link, Lavoie's prior bad acts were not relevant to the reasonableness of Lavoie's EMED at the time of the shooting.

Id. (emphases added).

Further, the Hawaiʻi Supreme Court has explained that generalized testimony such as evidence of defendant's propensity to lose her temper in stressful situations and that the infant victim could cry a lot, without more, is not probative to whether

defendant had acted under a loss of self-control resulting from EMED during the incident.  State v. Aganon, 97 Hawaiʻi at 304, 36 P.3d at 1274.  Applied here, the proffer of Galinato's and Kawai's generalized testimony that Thromman had attempted to obtain counseling for stress related to work and family in the days preceding the incident, or that he had suffered anxiety attacks in the months preceding the incident, without more, was not probative to whether Thromman had acted under a reasonably induced emotional disturbance causing a temporary loss of normal self-control when he shot Officer Fukada.

In this case, the Circuit Court did not err in precluding Galinato and Kawai from testifying.

D.  **The Circuit Court did not abuse its discretion in admitting video evidence of Thromman in police custody on the day of the incident.**

In his sixth point of error, Thromman asserts the Circuit Court abused its discretion in admitting into evidence State's Exhibit 431.  State's Exhibit 431 was media footage depicting Thromman on the day of the incident in police custody and being placed into a vehicle for transport.  The State offered Exhibit 431 as probative evidence to show Thromman's demeanor on the day of the incident and to rebut Thromman's argument that the deployed pepper spray canisters had affected Thromman's ability to see.  Thromman contends such evidence was irrelevant and that any probative value of the video was substantially outweighed by the danger of unfair prejudice.  We disagree and conclude the Circuit Court did not abuse its discretion in admitting the State's Exhibit 431.

"Relevant evidence may be excluded pursuant to HRE Rule 403 'if its probative value is substantially outweighed by the danger of unfair prejudice[.]'"  State v. Pasene, 144 Hawaiʻi 339, 362, 439 P.3d 864, 887 (2019) (alteration in original).  Here, Thromman asserts that State's Exhibit 431 was irrelevant to show Thromman's demeanor and ability to see because the video was recorded more than an hour after the pepper spray canisters were

deployed and in any event Thromman was too far away from the camera for the jury to actually observe his eyes or his demeanor. Thromman also asserts that whatever minimal probative value that the video had was substantially outweighed by the danger of unfair prejudice because viewing the media clip may have potentially evoked the jury's memories of the news coverage of the incident and because it shows Thromman in custody.

As to the probative value of the video, the Circuit Court noted that the video was the only evidence that depicted what Thromman looked like on the day of the incident. Therefore, it was probative to show his demeanor and his appearance on the day of the incident. We further note that the danger of unfair prejudice was low. As both the State and Thromman acknowledged, the evidence introduced at trial established that Thromman was taken into police custody after the incident.[13] Any prejudice from viewing the video of Thromman in police custody did not substantially outweigh the probative value of the video. We conclude the Circuit Court did not abuse its discretion in admitting State's Exhibit 431 into evidence.

**E.  The Circuit Court erred in permitting the admission of Heather's hearsay statements under HRE Rule 802.1 as substantive evidence.**

In his fifth point of error, Thromman asserts the Circuit Court erred in permitting Heather to be recalled at the end of the State's case-in-chief to admit audio recordings of certain statements that she made to HPD after the incident. The State sought to introduce the audio recordings at trial under the hearsay exception for prior inconsistent statements set forth in

_____

[13]  The State offered Exhibit 431 through the testimony of HPD Officer Joseph Stender (**Officer Stender**), one of the HPD officers who took Thromman into custody. Officer Stender testified, *inter alia*, to his recollection of Thromman being placed in custody and transported on the day of the incident.

HRE Rule 802.1[14] and 613(b).[15]  We conclude the audio recordings were improperly admitted under HRE Rule 802.1 because Heather was not capable of testifying substantively about the events described in her prior statement such as to allow the jury to meaningfully compare the prior version of the event with the version recounted at trial.  See State v. Canady, 80 Hawaiʻi 469, 480-81, 911 P.2d 104, 115-16 (App. 1996); State v. Clark, 83 Hawaiʻi 289, 295, 926 P.2d 194, 200 (1996).

The prior statements that the State introduced at trial were excerpts from an interview of Heather that was conducted and recorded days after the incident by HPD Detective Sandor Finkey (**Detective Finkey**).  Detective Finkey interviewed Heather while she was in the hospital, where she allegedly made the following statements about the incident that were memorialized in State's Exhibits 430E, 430F, 430G, 430I, 430J, 430K, 430L, and 430M as follows:

> 430E: "He stand up and he told me 'You're gonna die tonight.'  'If I cannot have you, nobody can have you, you gonna die'."
>
> 430F: "And um he came in the front room the kid's room..., I just put my son down to sleep and he was yelling at me, 'Fuck you, you fucking bitch.  You're gonna die[.]"
>
> 430G: Q.    When you say he punched you, do you recall um ah with what?
> A.    His fist.
> Q.    And he punch with, with what fist he punch you with, the left or the right or, or both?
> A.    His left hand.
> Q.    Okay.
> A.    Closed fist, he punched me twice.
>
> 430I: "[A]nd he told me I'm gonna grab the hammer and I wanna bash your head in[.]"

---

[14]  The relevant language of HRE Rule 802.1 is quoted in our discussion below.

[15]  HRE Rule 613(b) provides:

> (b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless, on direct or cross-examination, (1) the circumstances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement.

430J: "I just made it right out the kitchen door and he told me you better get your ass in this house before I shoot you.  And that's when he cock the gun and he shot me in my, in my thigh."

430K: "Um he laughed at me, he said good for me, you deserved it, and I better stay there or he's gonna put another bullet to the back of my head.  But when he shot me in my thigh, I passed out for a little while. I woke up and that's when I lean myself against the wall and I sat there and he was just laughing at me after."

430L: "Um he went, he went in the kitchen, he grab some ah gallon water and he was throwing water at my face, telling me if I'm thirsty.  Here drink some water you fucking bitch, drink some water, drink some water cause you're gonna die[.]"

430M: "[A]nd he told my daddy better turn around and get the fuck out of here cause he's gonna kill him too."

At trial, the State directly examined Heather as a witness and elicited testimony from her about her recollection of the incident.  After recounting the incident, Heather testified that she did not remember parts of the night.  The State then questioned her about her recorded interview with Detective Finkey, and whether she had an opportunity to listen to it prior to testifying at court.  Heather acknowledged that she listened to the recording, and that she recognized her voice in the recording.[16]  However, Heather indicated that she could not recall most of the events she described in the audio recording, noting that she could only remember having her fingers slammed in the door, getting shot in the leg, having various injuries to her head, and that Thromman had told her she "better stay."  Heather also testified that she could not remember what she had told the HPD officers during the interview because she claimed that she had "been on a lot of medications."

The State proceeded to question Heather whether she remembered making specific statements recorded in her interview, including statements reflected in State's Exhibits 430E-G and 430I-M, to which she continued to claim she could not recall.  At

_____

[16]  Heather also indicated that she initialed the copy of the recording after listening to it.

the end of the State's direct examination, Heather acknowledged that she testified to all that she could remember from what happened during the incident.  On cross-examination, Heather again acknowledged that she recognized her voice in the audio recording but could not recall whether she made some of those statements, or the accuracy of some of those statements.  The Circuit Court then dismissed Heather, subject to recall.

The State recalled Heather near the end of its case-in-chief.  At the hearing on Thromman's motion in limine opposing Heather's recall, the State indicated that it sought to admit redacted portions of the recorded interview under HRE Rules 802.1 and Rule 613(b) to impeach her prior testimony that she could not remember making certain statements or could not recall being punched or slapped by Thromman.  Thromman argued to the Circuit Court that the recordings could not be brought in as substantive evidence because Heather never denied making those statements, but rather testified that she no longer remembered the events pertaining to those statements.  The Circuit Court ultimately determined that it would allow the State to recall Heather to impeach her on the statements she testified to not remembering. The Circuit Court also noted that based on Heather's demeanor during hearings in this case, and her testimony that she did not remember some of the events, it was the Court's evaluation that Heather was more aligned to the defense than the State.

In its direct examination on recall, the State specifically questioned Heather whether she had made the statements recorded in her interview with Detective Finkey, to which she continued to assert that she could not remember.  The Circuit Court then conducted an HRE Rule 104 (preliminary questions concerning the qualification of a person to be a witness) hearing outside the presence of the jury so that the State could establish foundation regarding the identification of voices in the State's exhibits.  At the conclusion of the HRE Rule 104 hearing the Circuit Court admitted the recordings into evidence, and stated the following:

> The Court: So the 430 series whether it's, uh, E which was received into evidence the Court, uh, would state that, yes, uh, the witness is -- the witness did testify she did not remember making those statements on the exhibit. However, she did acknowledge that's her voice.
>
> The Court has also heard the detective who recorded the statements state the demeanor under which the witness has made those statements.  The Court has also considered the relationship between the witness and the defendant.
>
> And it is true generally a witness who claims to have forgotten the matter previously asserted, uh, there is no inherent contradiction because memories do fade and the witnesses may be telling the truth about not being able to recollect.
>
> On the other hand a witness who basically states, "Don't recall" or inability to remember may not escape cross-examination or -- or, uh, examination, uh, by asserting no recollection or not remember making the statements.
>
> And in admitting these exhibits the Court has considered and heard the tape of the witness's demeanor, the voice on the tape, the detailed statements on the tape by the witness and the relationship between the parties.
>
> <u>The Court also would note that the witness is here to be cross-examined by the -- a party who wishes to examine on the statement in the exhibits.  So that's the reason the Court is allowing these exhibits</u>.

(Emphasis added.)  During the hearing, the Circuit Court also acknowledged its determination that "with respect to [Heather] saying that she doesn't recall . . . . the Court will consider that inconsistent."  Once the jury was reconvened, the Circuit Court allowed the State to publish the audio recordings, and the Circuit Court gave no limiting instructions to the jury.[17]

Finally, on cross-examination during recall, Heather once again testified that she recognized her voice in the recordings and that she did not deny making those statements to

---

[17]  Prior to Heather's recall, the Circuit Court received State's Exhibits 430E-G, and 430I-L into evidence "subject to further foundation from [Heather]" through the testimony of Detective Finkey.  During the State's direct examination, Detective Finkey was asked whether Heather had made the statements recorded in the State's exhibits, to which he responded yes.  The Circuit Court gave limiting instructions to the jury that Detective Finkey's responses are not to be considered for the truth of the matter asserted.

Heather and Detective Finkey were recalled later that day to admit State's Exhibit 430M in a substantially similar manner.

Detective Finkey.  However, Heather testified that she could not remember being interviewed in the hospital.  Heather also testified that the only thing she could remember about the event described in the audio recording was that Thromman had closed the door on her, and that she told him to move out of the way so that she could leave the house.

We conclude the State's exhibits were not admissible under HRE Rule 802.1 as substantive evidence of the matters stated on the recordings because Heather testified she could not recall the events described in the audio recordings and thus was not subject to cross-examination concerning the "subject matter" of her prior statements.

HRE Rule 802.1(1) provides as follows:

> The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:
> (1)  Inconsistent statement.  <u>The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, the statement is inconsistent with the declarant's testimony</u>, the statement is offered in compliance with rule 613(b), and the statement was:
> (A)  Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition; or
> (B)  Reduced to writing and signed or otherwise adopted or approved by the declarant; or
> (C)  Recorded in substantially verbatim fashion by stenographic, mechanical, electrical, or other means contemporaneously with the making of the statement[.]

(Emphasis added.)  As this court explained:

> <u>[T]he rule was intended to exclude the prior statements of a witness who could no longer remember the underlying events described in the statement</u>.  Absent the opportunity to cross-examine a witness about the <u>material events described in a prior statement</u>, the statement would lack one of the twin guarantees of trustworthiness supporting its admissibility as substantive evidence of the matters asserted in the statement.
>
> Hence, unlike FRE Rule 801(d)(1), HRE Rule 802.1(1) requires more of the witness than just that he or she be placed on the stand, under oath and respond willingly to questions.  We hold that HRE Rule 802.1(1) requires, as a guarantee of the trustworthiness of a prior inconsistent statement, that the witness be subject to cross-examination about the subject matter of the prior statement, that is, <u>that the witness be capable of testifying substantively about the event, allowing the trier of fact to meaningfully</u>

> compare the prior version of the event with the version recounted at trial before the statement would be admissible as substantive evidence of the matters stated therein.

State v. Canady, 80 Hawaiʻi at 480-81, 911 P.2d at 115-16 (emphases added) (footnote, internal quotation marks, citations, and brackets omitted).  Here, the requirement of HRE Rule 802.1(1) that "[t]he declarant is subject to cross-examination concerning the subject matter of the declarant's statement" was not satisfied because Heather testified that she was unable to recall the events that she allegedly described in the audio recordings.  See id. at 481, 911 P.2d at 116.

While Heather testified to her recollection of the incident, she continually testified that she could not remember the events that she described in the audio recordings, that is, whether Thromman had threatened her before and after he had shot her, whether Thromman had punched her, whether Thromman threatened to kill her father, or whether Thromman threatened to kill her if she left the house.  Thus, Thromman was not afforded the opportunity to have Heather fully explain to the trier of fact why her testimony may have been inconsistent with her out of court statements to enable the jury to determine where the truth lay.  See Clark, 83 Hawaiʻi at 295, 926 P.2d at 200.

As explained above, while the Circuit Court noted that Heather was available at trial for cross-examination, "HRE Rule 802.1(1) requires more of the witness than just that he or she be 'placed on the stand, under oath and respond willingly to questions.'"  Canady, 80 Hawaiʻi at 480, 911 P.2d at 115 (citation and brackets omitted).  Accordingly, because Heather could not testify substantively about the specific material events described in the audio recording, Thromman was not afforded the opportunity to cross-examine her about the subject matter of the prior statement to allow the jury to meaningfully compare the prior version of the incident with the version recounted at trial.  See id. at 480-81, 911 P.2d at 115-16.

We further note that the Circuit Court gave no limiting instructions to the jury when the State's exhibits were published.  Accordingly, even if the audio recordings were properly introduced as extrinsic evidence to impeach Heather on her prior "inconsistent" statements, the failure to instruct the jury that the evidence was not to be considered as substantive evidence of Thromman's guilt was error.  See Clark, 83 Hawai‘i at 296, 926 P.2d at 201 (noting that if extrinsic evidence of witness's prior inconsistent statements was admissible only for purposes of impeachment, then the failure to instruct that the evidence was not to be considered as substantive evidence of defendant's guilt may have been error).

The State, citing State v. Fields, 115 Hawai‘i 503, 168 P.3d 955 (2007), responds that the fact Heather appeared at trial and testified was sufficient to satisfy the requirements of the confrontation clause.  However, Thromman's point of error challenges the admission of the audio recordings as inadmissible hearsay, improperly admitted under HRE Rules 802.1 and 613(b).  Thromman does not challenge based on the confrontation clause.[18]

The State also asserts the Circuit Court had an adequate basis to determine that Heather's claim of lack of memory was not credible, and thus inconsistent with her prior recorded statements.  However, the State fails to point to any authority that such a determination was relevant in admitting the audio recordings under HRE Rules 802.1 and 613(b).

Finally, we conclude the admission of the audio recordings as substantive evidence of Thromman's guilt was not harmless, in that "there is a reasonable possibility that the error complained of might have contributed to the conviction."

---

[18]  Different tests apply regarding the confrontation clause and HRE Rule 802.1.  With regard to the confrontation clause, the Hawai‘i Supreme Court noted that "this court has not adopted HRE Rule 802.1 as its test for whether a witness appears at trial for cross-examination."  See State v. Delos Santos, 124 Hawai‘i 130, 149-50, 238 P.3d 162, 181-82 (2010) (declining to interpret Fields to require cross-examination regarding the subject matter of the statement to satisfy the confrontation clause).

State v. Balisbisana, 83 Hawaiʻi 109, 114, 924 P.2d 1215, 1220 (1996) (citation and internal quotation marks omitted).  In the audio recordings, Heather stated, *inter alia*, that Thromman had threatened to kill her and her father, had punched her with a closed fist, had laughed at her after shooting her, and had threatened to kill her if she attempted to leave the house.  As challenged by Thromman, this evidence was admitted as substantive evidence when Heather was recalled as a witness by the State, and was not used only to impeach Heather.  Such evidence was probative regarding Thromman's convictions on count 7 (Terroristic Threatening in the First Degree relating to Timothy), count 10 (Kidnapping relating to Heather), and count 13 (Assault in the First Degree relating to Heather).

Therefore, Thromman's convictions on counts 7, 10, and 13 must be vacated, and the case remanded for a new trial on these counts.

**F.    The Circuit Court erred in denying Thromman's request to include Kidnapping in the merger instruction for the offenses involving Heather.**

In his third point of error, Thromman contends the Circuit Court erroneously denied his request to include Kidnapping in the merger instruction for the offenses involving Heather.  Thromman asserts this failure prevented the jury from considering whether Kidnapping was part of the same course of conduct as Assault in the First Degree against Heather.  Consequently, Thromman argues the convictions for Kidnapping and First Degree Assault should be vacated and remanded for the State to elect to dismiss one of the convictions or retry the charges with a merger instruction, pursuant to State v. Padilla, 114 Hawaiʻi 507, 509-10, 164 P.3d 765, 767-68 (App. 2007), as corrected (Aug. 16, 2007).  We agree that Kidnapping should have been included in the merger instruction.

The Hawaiʻi Supreme Court has stated:

> Generally, when the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element.  HRS § 701-109(1) (1993).

> A defendant may not, however, be convicted of more than one offense if the offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses. HRS § 701-109(1)(e).[19] Thus, this court has concluded that only one crime is committed when (1) there is but one intention, one general impulse, and one plan, (2) the two offenses are part and parcel of a continuing and uninterrupted course of conduct, and (3) the law does not provide that specific periods of conduct constitute separate offenses.

State v. Martin, 146 Hawaiʻi 365, 389, 463 P.3d 1022, 1046 (2020), as corrected (Apr. 23, 2020), reconsideration denied, No. SCWC-14-0001090, 2020 WL 2538923 (Haw. May 19, 2020) (citing Lavoie, 145 Hawaiʻi at 431-33, 453 P.3d at 251-53; State v. Matias, 102 Hawaiʻi 300, 75 P.3d 1191 (2003)) (brackets and footnote added).

Whether a defendant's conduct constitutes "separate and distinct culpable acts or an uninterrupted continuous course of conduct" is a question for the trier of fact. Martin, 146 Hawaiʻi at 390, 463 P.3d at 1047. "And, the jury should also be required to determine whether [the defendant] had one intention, one general impulse, and one plan to commit both offenses." Id. (citing Lavoie, 145 Hawaiʻi at 433, 453 P.3d at 253 (holding the determination of merger must be made by the trier of fact)).

---

[19] HRS § 701-109(1)(e) (2014) provides:

> **HRS §701-109 Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:
> . . . .
> (e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law provides that specific periods of conduct constitute separate offenses.

"This subsection reflects a policy to limit the possibility of multiple convictions and extended sentences when the defendant has basically engaged in only one course of criminal conduct directed at one criminal goal, or when it would otherwise be unjust to convict the defendant for more than one offense." HRS § 709-109 cmt.

The State contends that it can be inferred from Heather's testimony that the act and intent of Thromman by keeping Heather in the home with him (Kidnapping) is separate and apart from shooting her in the leg (Assault in the First Degree). However, the jury and not the trial court is to draw this inference, and the lack of a merger instruction precluded the jury from determining whether there was one intention, one general impulse, and one plan.

The State charged Thromman with Kidnapping as to Heather in count 10 and Assault in the First Degree as to Heather in count 13, alleging both occurred on July 13, 2015.  The Circuit Court's jury instructions on those counts also specified that date.  Through the State's opening statement, closing argument, and during Heather's testimony, the jury heard descriptions of the incident leading up to Heather being shot in the leg: Thromman had asked whether she wanted to work things out, Heather told him she did not want to and that there was someone else, and they began to argue.  Thromman then left the house and obtained from his car a rifle, which he loaded, and came back into the house, yelling.  In the meantime, Heather was holding her six-month old son in her arms.  Heather attempted to leave the house but Thromman closed the door on her hand and pulled her hair or her shirt to keep her in the house, where they continued to argue.  Heather called out for help and her uncle, Frank Coito (**Frank**), heard her, came to the house, and Thromman told Frank to leave, which Thromman allowed Frank to do. Heather, in the meantime, remained trapped in the house with her son.  Frank called Heather's parents, who arrived at the house. Thromman continued to block Heather from leaving, but Heather demanded to be let out so that she could give her son to her parents.  Thromman let Heather out through the kitchen door onto the ramp and kept a grasp on her hair or her shirt at arm's length as she handed her son over the railing to Timothy, her father.  While Heather was on the ramp leading from the carport up to the entryway into the house, Thromman grabbed her and tried

to drag her back into the house. Again, Heather tried to escape and managed to get outside on the ramp, with Thromman not far behind her, when he shot her in the right thigh. Given the record, the jury could have reasonably construed the evidence as supporting separate and distinct culpable acts of Kidnapping and Assault in the First Degree as to Heather, or as an uninterrupted continuous course of conduct, such that a merger instruction was warranted.

This court has determined that Kidnapping and Assault in the First Degree may be charged as continuous offenses because:

> First, the statutes proscribing first-degree assault and kidnapping do not prohibit charging the offenses as a continuing offense. . . . Second, the relevant element of first-degree assault (causes serious bodily injury) and kidnapping (restrains another) may constitute a continuous act or series of acts.

Smith v. State, No. CAAP-18-0000079, 2020 WL 2790498, at *10 (Haw. App. May 29, 2020) (mem.) (citation in quote and internal quotation marks omitted) (citing State v. Apao, 95 Hawaiʻi 440, 448, 24 P.2d 32, 40 (2001) (examining whether a specific unanimity instruction was required and stating "this court has previously stated that, under certain circumstances, kidnapping would be an example of a continuing offense")). Because these offenses can be charged as continuous offenses, and given the record in this case, the jury should have determined whether there was one intention, one general impulse, and one plan, that is, whether the two offenses merged. Martin, 146 Hawaiʻi at 390, 463 P.3d at 1047; State v. Hoey, 77 Hawaiʻi 17, 38, 881 P.2d 504, 525 (1994).

Here, as noted, the statutory language does not prohibit charging Kidnapping as a continuous offense. Notably, in its closing argument the prosecution relied on Thromman shooting Heather in the leg for the Kidnapping charge. Furthermore, the charge of Assault in the First Degree was based on Thromman shooting Heather with a firearm. Therefore, it is reasonably possible that the jury convicted Thromman of multiple

offenses (i.e., Kidnapping and Assault in the First Degree) based on the same conduct (shooting Heather in the leg with a firearm). Moreover, there was sufficient evidence of Kidnapping and Assault in the First Degree against Heather, as reflected by the jury's verdict.  Nonetheless, the trial court is not tasked with making factual findings regarding when each offense occurred or whether the defendant's conduct constitutes "an uninterrupted continuous course of conduct."  Lavoie, 145 Hawai'i at 433, 453 P.3d at 253. That is the province of the trier of fact.

We conclude the Circuit Court erred by failing to include Kidnapping (count 10) in the merger instruction.  Given our earlier holding to vacate count 10 (along with counts 7 and 13) due to the erroneous admission of the audio recordings of Heather's hearsay statements, the State does not have the option under Padilla to dismiss either Kidnapping (count 10) or Assault in the First Degree as to Heather (count 13), or to maintain the conviction as to one charge.  Instead, because both counts 10 and 13 are vacated and HRS § 701-109(1)(e) only prohibits conviction for merged offenses, the State is permitted to prosecute both counts in a new trial with an appropriate merger instruction. See Padilla, 114 Hawai'i at 517, 164 P.3d at 775.

G.    **The Circuit Court erred in imposing consecutive sentences without adequate reasons on the record.**

In his seventh point of error, Thromman contends that although no objection was raised, the Circuit Court plainly erred when it imposed consecutive sentences without adequate explanation on the record.  Thus, the sentences should be vacated and the matter remanded for resentencing.  We agree.

"Multiple terms of imprisonment run concurrently unless the court orders or the statute mandates that the terms run consecutively" and in determining whether a sentence runs concurrently or consecutively, the court is required to consider the factors set forth in HRS § 706-606 (2014).  HRS § 706-668.5

(2014).[20]  "[A] court <u>must</u> state its reasons as to why a consecutive sentence rather than a concurrent one was required." <u>Lewi v. State</u>, 145 Hawaiʻi 333, 350, 452 P.3d 330, 347 (2019) (emphasis added) (quoting <u>State v. Hussein</u>, 122 Hawaiʻi 495, 509, 229 P.3d 313, 328 (2010), <u>as corrected</u> (Apr. 28, 2010)).  "[T]he dual purposes behind the requirement that reasons be stated for a court's imposition of a consecutive sentence are to '(1) identify the facts or circumstances within the range of statutory factors that the court considered, and (2) confirm for the defendant, the victim, the public, and the appellate court that the decision was deliberate, rational, and fair.'"  <u>Id.</u> (brackets omitted) (quoting <u>State v. Kong</u>, 131 Hawaiʻi 94, 102-03, 315 P.3d 720, 728-29 (2013)).  "[T]he sentencing court is not required to articulate and explain its conclusions with respect to every factor listed in HRS § 706-606.  Rather, it is presumed that a sentencing court will have considered all factors before imposing

---

[20]  HRS § 706-668.5 provides, in relevant part:

> (1) If multiple terms of imprisonment are imposed on a defendant, whether at the same time or at different times . . . the terms may run concurrently or consecutively.  Multiple terms of imprisonment run concurrently unless the court orders or the statute mandates that the terms run consecutively.
> (2) The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider the factors set forth in section 706-606.

In turn, the factors set forth in HRS § 706-606 are as follows:

> (1)  The nature and circumstances of the offense and the history and characteristics of the defendant;
> (2)  The need for the sentence imposed:
>   (a)  To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;
>   (b)  To afford adequate deterrence to criminal conduct;
>   (c)  To protect the public from further crimes of the defendant; and
>   (d)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3)  The kinds of sentences available; and
> (4)  The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

concurrent or consecutive terms of imprisonment under HRS
§ 706-606."  Lewi, 145 Hawai'i at 350-51, 452 P.3d at 347-48
(footnote and internal quotation marks omitted) (quoting Kong,
131 Hawai'i at 102, 315 P.3d at 720).  "Thus, a sentencing court
is required to articulate its reasoning only with respect to
those factors it relies on in imposing consecutive sentences."
Id. at 351, 452 P.3d at 348 (quoting Kong, 131 Hawai'i at 102,
315 P.3d at 720).

In State v. Barrios, the Hawai'i Supreme Court affirmed
the defendant's convictions but vacated the sentence, as the
Circuit Court failed to adequately explain its rationale for
imposing multiple consecutive sentences that resulted in a one
hundred-year prison sentence.  139 Hawai'i 321, 321, 389 P.3d
916, 916 (2016).  The supreme court determined that the Circuit
Court examined the nature and circumstances of Barrios's crime
under HRS § 706-606(1) and the need for the sentence "[t]o
reflect the seriousness of the offense, [and] to promote respect
for the law" under HRS § 706-606(2)(a) in recounting the
following:

> This young child was a child, a baby.  I think she was
> eight years old when the abuse started.  Eight years
> old, a second grader, and it went on for years and
> years and years.  You groomed her.  You used threats.
> You used manipulation.  You used mind games.  You
> molded her to be a victim....
>
> The history and circumstances of the crime that the
> Court needs to look upon can be no more serious crime
> than the 72 A felonies that you're looking at, a total
> of 146 different counts.  You have no respect for the
> law.

Id. at 336, 389 P.3d at 931.  The Circuit Court also apparently
relied upon the need for the sentence to afford adequate
deterrence to the defendant's criminal conduct under HRS
§ 706-606(2)(b).  Id. at 337, 389 P.3d at 932 (first alteration
in original).  The court further considered the need for the
sentence "[t]o protect the public from further crimes of the
defendant" under HRS § 706-606(2)(c), id. (alteration in
original), in stating, "[i]t is the hope of this Court for the

35

safety of all children that you should never see the outside of a prison's walls."  Id. at 337, 389 P.3d at 932.  Notwithstanding the fact that the Circuit Court addressed statutory factors on the record, the Hawaiʻi Supreme Court determined that the Circuit Court did not sufficiently explain its decision to impose multiple consecutive sentences as required by Hussein and Kong. Id. As an example, the State recommended sentences for the counts for kidnapping and sexual assault counts to run concurrently with other sentences, but the Circuit Court imposed consecutive sentences for those same counts without stating reasons why it rejected the State's recommendation.  Id.

Here, the State argued for consecutive sentencing for count 3 (Attempted Murder in the Second Degree relating to Officer Fukada) and count 17 (Terroristic Threatening relating to Officer Ku) and count 26 (Terroristic Threatening relating to Officer Kim).  Thromman asked for all sentences to run concurrently and for the court to impose only the mandatory minimums.

For count 3, the Circuit Court imposed an "indeterminate period of LIFE with the possibility of parole, and with a mandatory minimum of fifteen (15) years[.]"  For counts 17 and 26, the Circuit Court imposed "an indeterminate period of FIVE (5) YEARS as to each count, with a mandatory minimum of three (3) years, consecutive with each other and consecutive with Count 3[.]"  All other sentences were imposed to run concurrently.

In announcing Thromman's sentence, the Circuit Court stated:

> In this case this is a -- an example of a domestic violence case that shows that there are more than two parties to a domestic violence case. Certainly, the primary party, the -- the brunt of the incident is the complaining victim.  Nevertheless, this case shows that there are more than the victim.
>
> In fact there are multiple victims in the domestic violence case such as this.  You have the family members who try to intervene.  You have the police officers in the community who tries [sic] to protect the family -- other family members and the victim in this case.  So domestic violence is not a --

a -- a case where only two people are involved and the State should not be involved.

A -- certainly the police officers are sworn to uphold the law, protect people, and certainly what -- what I've heard their lives are just as important as the victim.  Notwithstanding that they're trained to protect the public, they -- they're human beings like everybody.  They have families also, you know.  In the -- in the PSI, I've read the report from family members of the police officers, and certainly one -- the police officer got shot, stated succinctly, "people have bad days and certainly, you know, sometimes people break up.  It's not uncommon unfortunately.  But people don't go out shooting other people to try to maintain the relationship.

If that's the kind of relationship you want, to threaten somebody to stay in a relationship, that's not a relationship.  It's like being in prison.  It's like being -- keeping someone from going their separate ways [sic].  And like you mentioned it, certainly, yes, you may have problems within your relationship involving children, but does not -- that does not mean that you cannot raise the children separately.  In fact in this particular case, unfortunately, Mr. Thromman, I read a lot of support letters from you, your family, your friends, but unfortunately you made a bad choice that affects not only your life but affects other people's life's [sic]: The officer who was shot, the officers who were shot at, your family members, your children, and unfortunately for you, you know, like your lawyer points out, 24 hours will have affect -- will affect the rest of your life.

And so the Court having adjudge you guilty of Count 3, Attempted Murder in the Second Degree, it is the judgment and sentence of this Court that you be committed . . . for an indeterminate period of life with the possibility of parole with a mandatory minimum of 15 years.

. . . .

As to the counts 17 and 26, the Terroristic Threatening Against a [sic] Police Officers, it is the judgment and sentence of this Court that you be committed to the custody, [of the] Director, [of the] Department of Public Safety, for an indeterminate period of 5 years as to each count with a mandatory minimum of 3 years for each count. <u>Each count to run consecutively with each other and each count to run consecutively with Attempted Murder in the Second Degree.</u>

(Emphasis added.)

Applying <u>Hussein</u> and <u>Kong</u>, we must presume that the Circuit Court considered all factors before imposing concurrent

or consecutive sentences. <u>Kong</u>, 131 Hawaiʻi at 102, 315 P.3d at 728 (quoting <u>Hussein</u>, 122 Hawaiʻi at 503, 229 P.3d at 321). The Circuit Court in this case hinted at "[t]he need for the sentence imposed [(a)] to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense," pursuant to HRS § 706-606(2)(a), when it stated that a domestic violence case involves more than just the complaining victim and made references to the involvement of the police. However, similar to the trial court in <u>Barrios</u>, 139 Hawaiʻi at 337, 389 P.3d at 932, the Circuit Court failed to provide any meaningful rationale for imposing consecutive sentences for each of counts 3, 17, and 26. We therefore conclude that the Circuit Court erred in failing to place adequate reasons on the record for imposing consecutive sentences, in accordance with <u>Hussein</u> and <u>Kong</u>.

### V. Conclusion

Based on the foregoing, we affirm the following entered by the Circuit Court of the Third Circuit:

(1) the January 18, 2017 "Findings of Facts and Conclusions of Law re: Motion to Determine Voluntariness of Defendant's Statements"; and

(2) the January 31, 2017 "Findings of Fact and Conclusions of Law Re: Defendant's Motion to Dismiss Counts 14-15 in Cr. No. 15-1-216K and Counts 1-27 in Cr. No. 16-1-299K."

We vacate the "Judgment of Conviction and Sentence" entered on April 18, 2017, with respect to the conviction and sentence for: **count 7** (Terroristic Threatening in the First Degree as to Timothy Coito); **count 10** (Kidnapping as to Heather Coito); and **count 13** (Assault in the First Degree as to Heather Coito). We remand for a new trial on these counts.

We also vacate the "Judgment of Conviction and Sentence" entered on April 18, 2017, to the extent that it entered **consecutive sentencing** with respect to **count 3** (Attempted Murder in the Second Degree as to Officer Fukada), **count 17**

(Terroristic Threatening in the First Degree relating to Officer Ku) and **count 26** (Terroristic Threatening in the First Degree relating to Officer Kim).  We remand for further proceedings in the Circuit Court to address consecutive sentencing with respect to these counts.

In all other respects, we affirm the "Judgment of Conviction and Sentence" entered on April 18, 2017.

DATED:  Honolulu, Hawaiʻi, February 28, 2022.


On the briefs:                          /s/ Lisa M. Ginoza
                                        Chief Judge

Terri L. Fujioka-Lilley,
for Defendant-Appellant                 /s/ Katherine G. Leonard
                                        Associate Judge

Kauanoe A. Jackson,
Deputy Prosecuting Attorney,            /s/ Sonja M.P. McCullen
for Plaintiff-Appellee                  Associate Judge